JOHN WALSHE MURRAY (074823)
JENNY L. FOUNTAIN (226241)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone:  (650) 852-9000; (408) 907-9200
Facsimile:  (650) 852-9244
Email:  jwmurray@murraylaw.com
Email:  jlfountain@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>**ZF MICRO SOLUTIONS, INC.,**<br>A Delaware corporation,<br><br>Debtor.<br><br>926 Industrial Avenue<br>Palo Alto, CA 94303<br><br>Employer Tax I.D. No.: 30-0035122 | Case No. 10-60334-ASW-11<br><br>Chapter 11<br><br>Date:  July 21, 2011<br>Time:  3:00 p.m.<br>Place:  United States Bankruptcy Court<br>280 S. First St., Room 3020<br>San Jose, CA  95113<br>Judge:  Honorable Arthur S. Weissbrodt |

## SECOND MOTION FOR ORDER EXTENDING THE EXCLUSIVE PERIODS DURING WHICH ONLY THE DEBTOR MAY FILE A PLAN AND SOLICIT ACCEPTANCES THEREOF

K:\ZF Mirco Solutions\Pld\Mot- Exclusivity\Second Motion\Motv6.docx

SECOND MOTION FOR ORDER EXTENDING THE EXCLUSIVE PERIODS DURING WHICH ONLY THE DEBTOR MAY FILE A PLAN....

# **TABLE OF CONTENTS**

I.     SUMMARY OF RELIEF SOUGHT ..................................................................4

II.    RELEVANT FACTUAL SUMMARY ............................................................4

III.   RELEVANT PROCEDURAL HISTORY ..........................................................8

IV.   RELEVANT PROCEDURAL HISTORY OF THE TAT APPEAL .........................9

V.    MERITS AND ISSUES PRESENTED IN THE TAT APPEAL ..........................11

VI.   THE INSURANCE LITIGATION .............................................................12

VII.  THE CROSS ACTION ..........................................................................13

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................14

I.     JURISDICTION ...................................................................................14

II.    ARGUMENT ......................................................................................14

    A.    11 U.S.C. § 1121(D) PERMITS THE COURT TO EXTEND, FOR CAUSE, THE EXCLUSIVITY PERIODS BEYOND THE TIME LIMITATION SET FORTH IN THE BANKRUPTCY CODE......14

    B.    THE "FOR CAUSE" STANDARD...............................................15

    C.    CAUSE EXISTS TO EXTEND THE DEBTOR'S EXCLUSIVITY PERIODS............................16

        a.   Size And Complexity Of The Case..................................16

        d.   Whether The Debtor Has Demonstrated Reasonable Prospects Of Filing A Viable Plan.................................17

        f.   Whether The Debtor Is Paying Its Bills As They Become Due. ...................19

        g.   Whether The Debtor Has Made Progress In Negotiation With Its Creditors. .19

        h.   Extension Is Not For The Purpose Of Pressuring The Debtor's Creditors......20

        i.   Whether An Unresolved Contingency Exists. ..................20

III.   CONCLUSION....................................................................................21

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Gaines v. Perkins (In re Perkins)*,
    71 B.R. 294 (W.D. Tenn. 1987)....................................................................................16, 17

*In re Dow Corning Corp.*,
    208 B.R. 661 (Bankr. E.D. Mich. 1997) ........................................................................17, 21

*In re Express One International, Inc.*,
    194 B.R. 98 (Bankr. E.D. Tex. 1996) ...................................................................................16

*In re Gibson & Cushman Dredging Corp.*,
    101 B.R. ..........................................................................................................................17, 21

*In re Henry Mayo Newhall Memorial Hosp.*,
    282 B.R. 444 (9th Cir. B.A.P. 2002) ....................................................................................16

*In re McLean Industries, Inc.*,
    87 B.R. 830 (Bankr. S.D.N.Y. 1987) ...................................................................................16

*In re Public Service Co. of New Hampshire*,
    88 B.R. 521 (Bankr. D.N.H. 1988) ......................................................................................16

*In re Texaco, Inc.*,
    76 B.R. 322 (Bankr. S.D.N.Y. 1987) ...................................................................................21

*In re United Press Int'l.*,
    60 B.R. 265 (Bankr. D.D.C. 1986) ......................................................................................17

## FEDERAL STATUTES

11 U.S.C. §§ 1107 and 1108 ......................................................................................................9

11 U.S.C. § 1121(b) .................................................................................................................15

11 U.S.C. § 1121(c) .................................................................................................................15

11 U.S.C. § 1121(c)(3) .............................................................................................................15

11 U.S.C. § 1121(d) ......................................................................................................5, 15, 16

11 U.S.C. § 1121(d)(2) .............................................................................................................15

28 U.S.C. § 1334 .....................................................................................................................15

28 U.S.C. §§ 1408 and 1409 ....................................................................................................15

11 U.S.C. §  1121 ....................................................................................................................15

Case: 10-60334    Doc# 103    Filed: 06/30/11    Entered: 06/30/11 14:41:56    Page 3 of
22

K:\ZF Mirco Solutions\Pld\Mot- Exclusivity\Second Motion\Motyes.docx    2    SECOND MOTION TO EXTEND THE EXCLUSIVE
PERIODS DURING WHICH ONLY THE DEBTOR MAY FILE A PLAN....

11 U.S.C. § 363 ................................................................................................8

MISCELLANEOUS

H.R. REP. NO. 95-595, 95th Cong. 1st Sess. 406 (1977) ...........................16

S. REP. NO. 95-989, 95th Cong. 2d Sess. 118 (1978) ...............................16

K:\ZF Mirco Solutions\Pld\Mot- Exclusivity\Second Motion\Motvo.docx    3    SECOND MOTION FOR ORDER EXTENDING THE EXCLUSIVE
PERIODS DURING WHICH ONLY THE DEBTOR MAY FILE A PLAN....

**To:** **The Honorable Arthur S. Weissbrodt, United States Bankruptcy Judge:**

ZF Micro Solutions, Inc., a Delaware corporation, the debtor and debtor in possession herein (the "Debtor"), hereby submits its motion (the "Motion") for an Order extending the exclusive periods during which only the Debtor may file a plan of reorganization and solicit acceptances thereof. The Motion is based on the memorandum of points and authorities herein, the DECLARATION OF DAVID L. FELDMAN IN SUPPORT OF SECOND MOTION FOR ORDER EXTENDING THE EXCLUSIVE PERIODS DURING WHICH ONLY THE DEBTOR MAY FILE A PLAN AND SOLICIT ACCEPTANCES THEREOF (the "Feldman Declaration") filed concurrently herewith, the DECLARATION OF SUSAN H. HANDELMAN REGARDING STATUS OF STATE COURT APPEAL (the "Handelman Declaration"), and such other evidence as be submitted orally or in writing to the Court at or before the hearing on the Motion.

## I. SUMMARY OF RELIEF SOUGHT

1. This Motion requests that the Court enter an order pursuant to 11 U.S.C. § 1121(d)[1] extending the time during which only the Debtor may file a plan (the "Exclusive Filing Period") and obtain acceptances of a plan (the "Exclusive Solicitation Period") (collectively, the "Exclusivity Periods"). Specifically, the Debtor seeks an extension of nine (9) months, through and including April 1, 2012, of the Exclusive Filing Period and an extension of nine (9) months, through and including June 1, 2012, of the Exclusive Solicitation Period.

## II. RELEVANT FACTUAL SUMMARY[2]

2. The Debtor is a privately held fabless semiconductor company with its principal place of business in Palo Alto, California. It was founded and incorporated in Delaware by David L. Feldman ("Feldman") on January 28, 2002. Prior to the Debtor's incorporation, Feldman had founded and incorporated ZF Micro Devices, Inc., ("Devices") in California in July of 1995. In approximately late 2001 and early 2002, Devices' sole secured creditor, Gary Kennedy ("Kennedy"), who was also a Devices' Board member sitting by designation of investor Sands Brothers Venture Capital LLC ("Sands"), began foreclosure proceedings. On February 28, 2002,

---

[1] Unless as otherwise indicated, all statutory references are to title 11 of the United States Code (the "Bankruptcy Code" or "Code").

[2] A more detailed discussion of the Debtor's history is contained in earlier pleadings filed with the Court. *See, e.g.,* STATUS CONFERENCE STATEMENTS OF DEBTOR – Docket Numbers 57 and 83.

Kennedy purchased and acquired all of the assets of Devices by successfully credit bidding at the foreclosure sale. Immediately following the foreclosure sale to Kennedy, the Debtor, who had unsuccessfully bid at the sale, purchased the majority of Devices' assets from Kennedy and thereafter commenced operations on or about March 1, 2002.

3. In 1995, Devices began manufacturing and marketing a family of products based on an award-winning computer module called the OEM module Single Component Computer. These devices were, at the time, the most highly integrated, PC-compatible controller modules in the embedded systems market. They included full motherboard hardware and software functionality in a single, highly reliable component smaller than a credit card.

4. In 2000, Devices took this small form factor to the next level and combined full x86 PC functionality, together with its patented fail-safe technology, into a single chip, the ZFx86™ "PC-on-a-Chip." This device, just 1.4 inches square, represented the next level of integration of PC functionality. ZFx86™ is the only chip with a built-in FailSafe® mechanism for restoring operation after a system failure. The Intel x86 compatible ZFx86™ chip runs most PC software without modification and is bundled with a full PC BIOS and Linux O/S. It boots by simply applying power.

5. The Debtor outsources all chip layout, manufacturing, logistics and test functions while it supports all system architecture, technical support, sales and marketing internally. Prior to the foreclosure, Devices outsourced the chip layout, manufacturing, logistics and test functions to National Semiconductor Corporation ("NSC"). One of the assets acquired by the Debtor from Kennedy was the contract with NSC.

6. In March of 2002, NSC advised the Debtor that it would not honor the contract and would not manufacture the ZFx86™ for the Debtor. The Debtor filed a lawsuit in Santa Clara Superior Court against NSC. The suit went to a jury trial wherein the Debtor was awarded approximately $30 Million dollars. The court thereafter ordered a new trial based on a faulty jury instruction. The Debtor had exhausted its financial resources during the first trial and was unable to fund a new trial without additional capital contributions.

7. The Debtor thereafter solicited capital contributions from all of the original Devices shareholders ("Devices Shareholders") to fund the ongoing litigation. As part of the solicitation, the

Debtor indicated that if the new trial were successful and after attorneys' fees and litigation costs were paid, those Devices Shareholders who invested in the Debtor to fund the ongoing litigation (the "Debtor Investors") would receive approximately a 10X return on their investment into the Debtor to fund the new trial, and if any funds remained then Devices' creditors would be paid and finally a pro-rata share would go to all Devices Shareholders. Thirty-four (34) of the eighty (80) Devices Shareholders became Debtor Investors by providing capital to the Debtor, and the Debtor was able to proceed with the new trial. Effective January 31, 2005, the Debtor finalized a settlement agreement with NSC ending an almost 3 year legal dispute wherein the Debtor was to receive approximately $20 Million dollars in cash and certain intellectual property. The settlement proceeds were deposited into the Debtor's attorney's trust account on approximately February 1, 2005, and thereafter were distributed to the Debtor Investors in accordance with their level of investment and the Debtor's promise of a 10X return (the "NSC Settlement Distributions"). The remainder of the funds, approximately $3.7 Million dollars, was then deposited into the Debtor's general operating account. All of the Debtor's outstanding creditor claims were paid in full before the NSC Settlement Distributions were made in February 2005.

8. On February 14, 2005, TAT Capital Partners LTD., f/k/a TAT Investment Advisory LTD ("TAT"), Sands and SB New Paradigm Associates LLC ("SB" and with Sands, the "Sands Parties" and with Sands and TAT, the "Plaintiffs" or "Respondents") filed suit in Santa Clara County Superior Court against the Debtor and the Debtor Investors alleging, among other things, that the NSC Settlement Distributions made to the Debtor Investors were fraudulent transfers (the "TAT Suit"). All of the Plaintiffs were Devices Shareholders but none of the Plaintiffs contributed capital to the Debtor or ever became Debtor Investors. The Debtor filed a mandatory counterclaim for breach of fiduciary duty, among other claims, (the "Cross Action") and the TAT Suit was eventually consolidated with the Cross Action. The court, however, later severed the Cross Action. The TAT Suit proceeded to a three phase trial wherein, during phase one, the court determined that the Plaintiffs and the Debtor had entered into certain enforceable contracts. During the second phase, a jury returned a verdict that the Debtor had breached its contract with the Plaintiffs on February 5, 2005 causing harm to the Plaintiffs in the aggregate amount of $4,390,506.03. During the third

phase of the trial, on May 12, 2010 the jury returned a verdict that each of the NSC Settlement Distributions made to the Debtor Investors constituted actual fraudulent transfers. Thereafter, on June 10, 2010, the court entered judgment against the Debtor and the Debtor Investors, and on August 23, 2010, the court entered a first amended judgment in favor of the Plaintiffs and against the Debtor (the "TAT Judgment") as follows: judgment in favor of TAT in the amount of $4,460,447.70, plus costs; Judgment in favor of the Sands Parties in the amount of $2,135,859.63, plus costs. The court also entered judgments against the individual Debtor Investors in favor of the Plaintiffs in the respective amounts received as part of the NSC Settlement Distributions.

9. On June 14, 2010, TAT filed an Abstract of Judgment against the Debtor in the amount of $4,550,447.70. On June 17, 2010, TAT requested and the court entered a Writ of Execution against the Debtor for $4,550,472.70, plus cost and daily interest. On June 29, 2010, TAT filed a Notice of Levy against the Debtor's bank account and obtained approximately $5,800 from the Debtor's account as a result thereof. TAT has since filed a partial satisfaction of judgment to reflect the reduction of its judgment lien by the approximately $5,800 obtained from the account levy.

10. The Debtor has appealed the TAT Judgment which appeal is pending (the "TAT Appeal"). After the May 2010 jury verdict in the TAT Suit, the Debtor and certain of the Debtor Investors (collectively, the "Appellants") began preparing for an eventual appeal and retained Ropers, Majeski, Kohn & Bentley ("Ropers") for the sole purpose of serving as appellate counsel. On August 25, 2010, Ropers, on behalf of Appellants, filed a Notice of Appeal. On January 19, 2011, this Court approved the employment of Ropers as special appellate counsel for Debtor. Susan Handelman ("Handelman") is lead counsel for Ropers relative to the TAT Appeal.

11. The Debtor generates approximately $10,000 a month in gross revenue. The $3.7 Million dollars the Debtor received out of the NSC Settlement Distributions was fully exhausted to cover operating costs and to defend against the TAT Suit as well as to prosecute suits against the Debtor's Directors' and Officers' insurance carriers relating to refusals to defend. Both the TAT Suit and a suit against one of the Debtor's insurance carriers are on appeal. The Debtor has had to suspend salaries for all employees and terminate or furlough all employees. In addition, the Debtor

has borrowed approximately $700,000.00 from its shareholders to maintain operations and defend and prosecute the various suits.

12. The Debtor does not have sufficient assets to satisfy the TAT Judgment, much less satisfy the TAT Judgment and continue operations. As such, if the Debtor is not successful on the TAT Appeal, the Debtor may liquidate, raise additional capital, sell its assets pursuant to section 363 of the Code, or file a Chapter 11 plan addressing all claims as discussed hereinafter. On the other hand, if the Debtor is successful, the Debtor will be able to start anew and focus solely on product development, marketing and income generation, either in or out of Chapter 11.

### III. RELEVANT PROCEDURAL HISTORY

13. On October 1, 2010, (the "Filing Date"), the Debtor filed for relief under Chapter 11 of the United States Bankruptcy Code. On October 4, 2010, the Debtor filed its Voluntary Petition. The Debtor is presently operating its business as a debtor in possession pursuant to the provisions of 11 U.S.C. §§ 1107 and 1108.

14. The Debtor has requested, and the Court has approved, authorization to employ the following: (1) Murray & Murray, A Professional Corporation, as its bankruptcy counsel in this case; (2) Ropers as its special appellate counsel to advise and represent the Debtor with respect to the TAT Appeal; and (3) joint employment of the law firms of Adelson Hess & Kelly ("AHK") and Shernoff Bidart Echeverria, LLP ("SBE") related to representing the Debtor in the appeal of an action brought by the Debtor against one of its Directors' and Officers' insurance carriers. The Debtor initially anticipated hiring attorney Anthony Trepel, now of Trepel Greenfield Sullivan and Draa, LLP, as its special trial counsel to prosecute the Cross Action however due to alleged conflict of interest matters, the Debtor has not sought such employment authorization and does not currently have counsel engaged to represent it with respect to the Cross Action.

15. On December 30, 2010, the Court entered its ORDER AFTER HEARING ON DEBTOR'S MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL ("Cash Collateral Order") whereby it determined that certain of the Debtor's property is not subject to TAT's judgment lien and that the Debtor may use, without providing additional adequate protection, all cash collateral that is subject to TAT's judgment lien.

16. To date, no official committee of unsecured creditors has been appointed in this case.

17. The Court has established a claims' bar date of February 8, 2011 for the filing of non-governmental proofs of claim, and March 30, 2011 for the filing of governmental proofs of claim.

18. The parties stipulated to relief from stay so that the TAT Appeal and the Cross Action may proceed.

19. On February 11, 2011, after a duly noticed hearing, this Court entered its ORDER AFTER HEARING ON DEBTOR'S MOTION FOR ORDER EXTENDING THE EXCLUSIVE PERIODS DURING WHICH ONLY THE DEBTOR MAY FILE A PLAN AND SOLICIT ACCEPTANCES THEREOF, whereby the Exclusive Filing Period was extended through and including August 1, 2011, and the Exclusive Solicitation Period was extended through and including October 1, 2011. This is the Debtor's second request to extend the Exclusivity Periods.

20. Currently, the Debtor has scheduled almost $8 million dollars in unsecured debt. Any plan of reorganization must include provisions to restructure all of Debtor's unsecured debts. If the Debtor is successful on the TAT Appeal, approximately $6.5 million dollars of its currently scheduled debts will be eliminated and it may be more economical for the Debtor to dismiss the case and negotiate with its remaining creditors than to draft, file, solicit and confirm a plan. If the Debtor is unsuccessful on the TAT Appeal however, the Debtor may file a plan, be forced to convert the case to chapter 7 or sell its assets pursuant to a 363 sale, among other things.

## IV. RELEVANT PROCEDURAL HISTORY OF THE TAT APPEAL

21. In August, 2010, the Debtor, among other defendants, filed a notice of appeal from the TAT Judgment. Pursuant to the TAT Judgment, Respondents are entitled to approximately $6.7 million plus costs of suit and post-judgment interest. In connection with the TAT Appeal, Appellants *other than* Debtor, Feldman and Marsha Feldman Armstrong posted appeal bonds in excess of $5 million. In addition, Respondents collected over $400,000 by executing on the judgment(s) before the bonds were perfected and/or by voluntary payments by various defendants.

22. The TAT Appeal is currently pending in the California Court of Appeal, Sixth Appellate District (the "Court of Appeal"), assigned Appeal No. H035968.

23. On January 4, 2011, the Santa Clara Superior Court filed the appellate record in the

Case: 10-60334   Doc# 103   Filed: 06/30/11   Entered: 06/30/11 08:44:56   Page 10 of 22

K:\ZF Mirco Solutions\Pld\Mot- Exclusivity\Second Motion\Motv6.docx   9   SECOND MOTION FOR ORDER EXTENDING PERIODS DURING WHICH ONLY THE DEBTOR MAY FILE A PLAN....

Court of Appeal.  The appellate record is extensive—36 volumes of Reporter's Transcript and 48 volumes of Clerk's Transcript.  The Court of Appeal's docket states that the record was delivered to the Court of Appeal in seven boxes.

24.     On May 3, 2011, with <u>one</u> stipulated 60-day extension of time, plus the time afforded by the Court of Appeal's rules, the Debtor served on Respondents and sent to the Court of Appeal the APPELLANTS' OPENING BRIEF (the "<u>Debtor's Opening Brief</u>"), a true and correct copy of which is attached to the Handelman Declaration as **Exhibit "1"**.  The Debtor's Opening Brief was accompanied by a motion to file an oversized brief consisting of 16,656 words (as compared to a normal sized brief of 14,000 words).

25.     On May 19, 2011, the Court of Appeal granted the Debtor's motion to file an oversized brief and "officially" filed the Debtor's Opening Brief.  The Court of Appeal set the due date for TAT's and Sand's RESPONDENTS' BRIEFS (the "<u>Responses</u>") for June 20, 2011.  The same day the court granted the Debtor's motion and filed the Debtor's Opening Brief, May 19, TAT and Mark Putney, through TAT's counsel, moved the Court of Appeal to disqualify Ropers from representing the Appellants, including the Debtor, in the TAT Appeal and moved to strike the Debtor's Opening Brief.  Ropers, through retained counsel, opposed the disqualification motion. The disqualification motion/strike motion remains pending, but the Court of Appeal's docket indicates that the Court of Appeal plans to issue an order on the motion on July 5, 2011.

26.     Three business days after the Debtor's Opening Brief was "officially" filed (and TAT had moved to strike it), on May 24, 2011, TAT's counsel requested the Debtor stipulate to a 60-day extension of time (from June 20 to approximately August 20) for TAT and Sands to file their Response.  Because appellate counsel for TAT (and Sands) were also trial counsel and are very familiar with the appellate record, and because of the need to move the state court appeal along quickly, the Debtor offered TAT and Sands a stipulation to a *30 day extension of time*, rather than 60 days.

27.     On May 24, 2011, TAT's counsel rejected the Debtor's offer of a 30 day stipulated extension and announced TAT and Sands would apply to the Court of Appeal for a 60-day extension.

28.     On May 31, 2011, Debtor filed, with the Court of Appeal, a document entitled NOTICE OF NON-OPPOSITION TO 30-DAY EXTENSION OF TIME TO FILE RESPONDENTS' BRIEFS.  In that document, the Debtor informed the Court of Appeal of the Debtor's 30 day stipulated extension offer and why 30 days is sufficient given the circumstances.

29.     On June 9, 2011, Respondents filed an application for a 60-day extension of time in the Court of Appeal.

30.     On June 16, 2011, the Court of Appeal granted Respondents a 30-day extension of time to file their Responses.  The Responses are due on July 20, 2011.  The Court of Appeal's rules provide an "automatic grace period" of an additional 15 days, and as such the Debtor expects the Responses will be filed in early August.

31.     After Respondents' Responses are filed, the Debtor anticipates that it will file a reply brief in September, 2011.

32.     Thereafter, the Court of Appeal will hear oral argument and issue a decision.

33.     The Debtor has utilized best efforts to move the TAT Appeal along quickly and will continue to do so.  The Debtor expects that the Court of Appeal will issue a decision in the TAT Appeal before April 1, 2012.

## V.     MERITS AND ISSUES PRESENTED IN THE TAT APPEAL

34.     Attached as **Exhibit "1"** to the Handelman Declaration, filed concurrently herewith, is a true and correct copy of the Debtor's Opening Brief in the TAT Appeal.  In that brief, the Appellants raise crucial issues, some of which are of a Constitutional dimension, including: (1) the trial court's functional deprivation of a requested jury trial on the fundamental breach of contract claim in the case against the Appellants; and (2) exclusion of *defendant* and Debtor's corporate representative and Responsible Individual, Feldman, from the courtroom, then banning him from being near the courtroom, then banning him from being anywhere in the courthouse where the jurors might see him.  In addition, the Debtor's Opening Brief establishes that the judgment imposes statutorily impermissible, excessive damages against the Appellants, lays out that the trial court, on the first day of trial, impermissibly severed *out of the case* the Appellants' entire cross-complaint (which a court had previously characterized as a "compulsory" cross-complaint), and addresses

Respondents' lack of "standing."

35.     As special appellate counsel appointed by this Court, based on more than 20 years of experience as an appellate attorney, certification by the California State Bar as an appellate specialist, and review of the entire record in the TAT Appeal, the Debtor's special appellate counsel Handelman believes that Appellants have raised serious and meritorious issues on appeal that justify reversal of the judgment(s) entered against them.

## VI.     THE INSURANCE LITIGATION

36.     Pre-petition, the Debtor brought a suit against Underwriters at Lloyd's London, its original Director's and Officer's insurance carrier in Santa Clara County Superior Court (case number 1-04-CV-017803) relating to a claim arising out of the NSC Litigation ("Lloyd's Suit"). The court issued its summary judgment in favor of the defendant and the Debtor appealed and oral arguments were heard pre-petition.  Post-petition, the appellate court affirmed the summary judgment award and granted the defendant its costs.  Since that time, and pursuant to Court order, the Debtor and the defendant have agreed to dismiss the suit against Underwriters at Lloyd's London with prejudice.

37.     Pre-petition, the Debtor brought a related suit against Illinois Union Insurance, the Debtor's superseding Director's and Officer's Insurance carrier, entitled *ZF Micro et. al. vs. Illinois Union Insurance*, case number 1-04-CV-07803, originally filed in Santa Clara County Superior Court (the "Union Suit").  Eventually the Lloyd's Suit and Union Suit were consolidated.  Pursuant to the Union Suit, the Debtor brought suit against defendant insurer for its refusal to defend in certain state court actions. The Debtor is seeking substantial damages, including defense fees, consequential damages and punitive damages from the defendant.  The court granted summary judgment in favor of the defendant Illinois Union Insurance and the Debtor appealed (the "Insurance Appeal").  The matter is on appeal before the Court of Appeal.  The matter has been fully briefed. Oral arguments are set for July 13, 2011.  The Debtor understands that, generally, a decision by the Court of Appeal will be issued within ninety days after the matter is submitted at oral arguments (well before exclusivity will expire if this Court grants this Motion).

38.     The issues before the Court of Appeal include, among others:

1      a.      In 2002, NSC filed a cross-complaint against Debtor, among others, that alleged a

breach of contract cause of action against Devices and sought recovery against the Debtor under the

doctrine of successor liability. Defendant Illinois Union claimed that the breach of contract cross-

complaint against Devices by NSC constituted a prior claim during a period when Illinois Union was

not the company's insurer. However, the Debtor alleges, among other things, that Illinois Union is

the proper insurer because part of the claimed coverage arises out of a claim by NSC against

Feldman which was first raised when NSC named Feldman as a cross-defendant for the first time in

its amended cross-complaint in 2003 during the period Illinois Union's coverage was in effect;

      b.      Whether the insolvency exclusion applies; and

      c.      Triable issues of material fact also exist as to the cause of action for breach of the

implied covenant of good faith and fair dealing regarding the denial of the original claim and cross

complaint claim against Feldman.

## VII. THE CROSS ACTION

39.      The Debtor has not begun prosecuting the Cross Action against TAT for the

following reasons, among others:

      a.      Action has been delayed on the Cross Action pending a ruling in the TAT Appeal

because severing of the Cross Action from the TAT Suit is a key issue in the TAT Appeal and

Debtor believes it is optimal and most efficient if all arguments related to the severing of the Cross

Action are decided by the Court of Appeal before proceeding with the Cross Action; and

      b.      TAT alleged that the Debtor's proposed counsel, Anthony Trepel, has a conflict of

interest based on the fact that Anthony Trepel testified at trial in the TAT Suit. As such, Debtor

must locate and engage new counsel to proceed once the Court of Appeal issues a ruling on the TAT

Appeal.

///

///

///

///

///

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. JURISDICTION

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is 11 U.S.C. § 1121(d).

### II. ARGUMENT

**A. 11 U.S.C. § 1121(d) Permits The Court To Extend, For Cause, The Exclusivity Periods Beyond The Time Limitation Set Forth In The Bankruptcy Code.**

2. Section 1121 of the Bankruptcy Code provides a debtor the exclusive right to file a plan during the first 120 days after the order for relief. Specifically, section 1121(b) states that "[e]xcept as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter." 11 U.S.C. § 1121(b). If a debtor files a plan within the 120-day period, section 1121(c)(3) provides an additional sixty (60) days during which only the debtor may obtain acceptances of a plan. Specifically, section 1121(c) provides, in part, that non-debtor parties in interest may file a plan, if and only if :

. . .

(2) the debtor has not filed a plan before 120 days after the date of the order of relief . . . or

(3) the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter, by each class of claims or interests that is impaired under the plan.

11 U.S.C. § 1121(c).

3. Notwithstanding the foregoing, section 1121(d) provides that the Exclusivity Periods may be extended for a maximum of eighteen months (Exclusive Filing Period) and a maximum of twenty months (Exclusive Solicitation Period), respectively.[3] The extensions requested herein are within the limits set forth by section 1121(d)(2). This Motion requests an extension of the Exclusive Filing Period for nine (9) months, through April 1, 2012 (for a total of 18 months from the Filing

---

[3] Section 1121(d)(2) provides as follows:

(A) The 120-day period . . . may not be extended beyond a date that is 18 months after the day of the order for relief under this chapter.

(B) The 180-day period . . . may not be extended beyond a date that is 20 months after the date of the order for relief under this chapter.

Date) and an extension of the Exclusive Solicitation Period for nine (9) months, through June 1, 2012 (for a total of 20 months from the Filing Date).

**B. The "For Cause" Standard.**

4. The Bankruptcy Code does not define "cause" for purposes of section 1121(d) or establish a formal standard by which to establish cause for an extension of the Exclusivity Periods. Courts, however, have interpreted the "cause" standard in section 1121(d) as a general standard that allows a bankruptcy court "maximum flexibility to suit various types of reorganization proceedings." *See In re Public Service Co. of New Hampshire*, 88 B.R. 521, 534 (Bankr. D.N.H. 1988); *see also Gaines v. Perkins (In re Perkins)*, 71 B.R. 294, 297 (W.D. Tenn. 1987) ("[t]he hallmark of [§ 1121(d)] is flexibility"); *see also In re McLean Industries, Inc.*, 87 B.R. 830, 833 (Bankr. S.D.N.Y. 1987). The legislative history of section 1121(d) reflects a Congressional intent to allow a debtor to remain in control of the bankruptcy process to some degree while also recognizing the legitimate interest of creditors in the debtor's case. *See* H.R. REP. NO. 95-595, 95th Cong. 1st Sess. 406 (1977). Section 1121(d) aims to strike a balance between a debtor's interest to reorganize, and the concern that an open-ended exclusive period could encourage a debtor to stall in order to put pressure on creditors to accept a plan. *See* S. REP. NO. 95-989, 95th Cong. 2d Sess. 118 (1978).

5. The Ninth Circuit Bankruptcy Appellate Panel opined that, in assessing whether cause exists under section 1121(d), the "transcendent" consideration is whether the adjustment of exclusivity will facilitate moving the case forward toward a fair and equitable resolution of the case while taking into account all divergent interests involved. *See In re Henry Mayo Newhall Memorial Hosp.*, 282 B.R. 444, 453 (9th Cir. B.A.P. 2002). Factors courts often consider when addressing this question include the following: (1) the size and complexity of the case; (2) the amount of time that has elapsed in the case; (3) the existence of good faith progress; (4) whether the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects of filing a viable plan; (6) the necessity of sufficient time for the debtor to negotiate a plan; (7) whether the debtor has made progress in negotiation with its creditors; (8) whether the debtor is seeking an extension in order to pressure creditors to submit to the debtor's reorganization demands; and (9) whether an unresolved contingency exists. *See In re Express One International, Inc.*, 194 B.R. 98,

100 (Bankr. E.D. Tex. 1996); *see also In re Dow Corning Corp.*, 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997).

**C.     Cause Exists To Extend The Debtor's Exclusivity Periods.**

      **a.     <u>Size And Complexity Of The Case.</u>**

      6.     While this case is significant in terms of creditors, assets, liabilities and unique complexities, courts have recognized that a bankruptcy estate of epic proportions is not a prerequisite to the granting of an extension of the exclusivity period based on size and complexity. *See In re United Press Int'l.*, 60 B.R. 265, 270 (Bankr. D.D.C. 1986). "Referring to the House Report to the 1978 Bankruptcy Act (the 'House Report'), Courts note that 'cause' may be found if there is 'an unusually large *or unusually small case* . . . .'" *In re Gibson & Cushman Dredging Corp.*, 101 B.R. at 409 (emphasis added) (citations omitted). For instance, in the case of *In re Perkins,* the court found that an extension was justified where there were approximately 100 creditors holding 225 claims, totaling approximately $10 Million. *See In re Perkins*, 71 B.R. at 296.

      7.     The Debtor's estate is similar to that in the *Perkins* case - the Debtor's Schedules reflect $7.9 Million in liabilities and in excess of $178,000 in assets (without taking into consideration the value of the Debtor's intellectual property). In addition, there are over 100 creditors and parties-in-interest. As such, an extension is warranted.

      8.     Moreover, the Debtor is party to two complicated state appellate cases. The record in the TAT Appeal alone consists of 36 volumes of Reporter's Transcript and 48 volumes of Clerk's Transcript and was delivered to the Court of Appeal in seven boxes.

      9.     This case's size and complexity warrant an extension of the Exclusive Periods.

      **b.     <u>The Amount Of Time That Has Elapsed In The Case</u>**.

      10.     Just over nine (9) months have passed since the Filing Date. During these first months of the case, the Debtor has focused on maintaining its day to day operations, complying with the bankruptcy rules and procedures and focusing on the TAT Appeal. This Motion is the Debtor's second request for an extension of the Exclusivity Periods.

      **c.     <u>The Existence Of Good Faith Progress</u>**.

      11.     The Debtor has made significant progress to date. For instance, the Debtor has

instituted cost cutting measures and has negotiated with its landlord for a reduced foot print and lease payments as of February 1, 2011. Pursuant thereto, the Debtor and landlord entered into a new lease, which was approved pursuant to Court Order. Likewise, the Debtor no longer pays for Feldman's health insurance, nor does it pay for the health insurance of its engineering consultants

12. The Debtor has also successfully prosecuted a contested cash collateral motion.

13. In addition, the Debtor filed its Schedules of Assets and Liabilities, Statement of Financial Affairs and other requisite pleadings commencing this case, complied with the Office of the United States Trustee's request for Initial Debtor Interview and additional documentation and information, and attended the Initial Debtor Interview and the Meeting of Creditors. The Debtor is current on its monthly operating reports and quarterly fees.

14. The Debtor has maintained a level of sales that has allowed it to operate without disruption.

15. Finally, the Debtor expeditiously filed the Debtor's Opening Brief in the TAT Appeal and is maintaining best efforts to move along the TAT Appeal and the Insurance Appeal (for which briefing has been completed, oral argument set for early July 2011 and the Debtor anticipates a ruling shortly thereafter).

**d.** **Whether The Debtor Has Demonstrated Reasonable Prospects Of Filing A Viable Plan.**

16. The question of the Debtor's ability to propose a viable plan, while not ripe, is easily answered. The Debtor's debts consist overwhelmingly of unsecured debt, all of which must be addressed under a plan of reorganization. However, if the Debtor is successful on the TAT Appeal, approximately $6.5 Million in unsecured debt will be eliminated. At that point, the Debtor will be better able to formulate a plan without contingencies or alternatives relative to the TAT Appeal.

17. Likewise, if the Debtor does not succeed, the Debtor believes that it can obtain sufficient funding from new equity to fund a confirmable and successful chapter 11 plan. Plan terms will necessarily depend upon the outcome of the TAT Appeal and the Cross Action as each may significantly alter the Debtor's liabilities and assets. Assuming, however, that the Debtor is unsuccessful on the TAT Appeal, possible plan alternatives include, without limitation, either a liquidating plan or a reorganization plan that will pay its allowed secured claims in full and eliminate

SECOND MOTION FOR ORDER EXTENDING
17   PERIODS DURING WHICH ONLY THE DEBTOR MAY FILE A PLAN....

Case 4:10-60334   Doc# 103   Filed: 06/30/11   Entered: 06/30/11 08:44:56   Page 18 of
K:\ZF Mirco Solutions\Pld\Mot- Exclusivity\Second Motion\Motv6.docx
22

1    most unsecured debt. Of the unsecured debt, approximately $6.5 Million is held by TAT and Sands

2    and approximately $1.5 Million is held by other creditors. With respect to allowed unsecured

3    claims, the Debtor anticipates a plan with various classes. It is anticipated that all classes will be

4    impaired and that at least one impaired class entitled to vote will vote to accept the plan.[4]

5                    **e.    The Necessity Of Sufficient Time For The Debtor To Formulate A Plan.**

6            18.    The Debtor needs additional time to formulate a plan as plan terms will be dependent

7    upon the outcome of the currently pending TAT Appeal and Cross Action. While many chapter 11

8    plans contain contingencies and alternatives, it is unnecessary and impractical to incur the expense

9    of formulating, filing and soliciting a plan in this case at this time. The outcome of the TAT Appeal

10   will affect whether a plan is even necessary. If the Debtor determines that filing a plan is necessary,

11   the outcome of the TAT Appeal will affect plan terms and creditor payouts, as it may either solidify

12   or eliminate approximately $6.5 Million in unsecured claims. As such, any plan formulated at this

13   time would either require multiple revisions as the TAT Appeal is decided or must contain multiple

14   alternatives, the implementation of which would be dependent upon the outcome of the TAT Appeal,

15   among other things. Thus, efficiency, economy and preservation of the bankruptcy estate is the

16   driving force behind the Debtor's Motion.

17           19.    Moreover, the Debtor should be allowed time to formulate its plan without the fear

18   of receiving, and burden and expense of opposing, a third party competing plan. Given its activity in

19   this case and the fact that it objected to the Debtor's first request to extend exclusivity, the Debtor

20   believes that unless exclusivity is extended, TAT will file a competing plan, and most likely a

21   liquidating plan. The rationale and motivation behind any such plan, however, would be suspect

22   given that TAT has an unsecured claim in excess of $4.4 Million against an estate with hard assets

23   valued at less than $200,000 (any payout would be nominal (total unsecured claims exceed $7.9

24   Million) and quite likely would be less than the legal fees incurred in drafting, soliciting, defending

25   and confirming the plan). Moreover, as Handelman declares in the Handelman Declaration, based

26   upon her experience and expertise, the TAT Judgment should be reversed based on the merits and

27   issues raised.

28   _____
            [4] The Debtor reserves its right to propose a plan on different terms than those identified in this
     Motion.

20. Finally, if the Debtor is successful in the Cross Action, TAT could be liable to the bankruptcy estate for millions of dollars. Again, any plan formulated now would be a bare bones plan with multiple place holders and alternative terms dependent upon the resolution of the TAT Appeal and the Cross Action. It would be impractical and expensive to submit such an uncertain plan to creditors and it would only cause unnecessary expense to the bankruptcy estate and confusion in the creditor body.

    f.    Whether The Debtor Is Paying Its Bills As They Become Due.

21. The Debtor has paid and continues to pay its bills in the ordinary course.

    **g.    Whether The Debtor Has Made Progress In Negotiation With Its Creditors.**

22. The claims bar dates expired on February 8, 2011 for non-governmental entities and March 30, 2011 for governmental entities, respectively. Accordingly, the Debtor has just begun to review and reconcile claims. TAT and Sands have filed claims in this case based on the TAT Judgment. At this time the Debtor has not objected to those claims, but reserves the right to do so pending the outcome of the TAT Appeal and otherwise. To that end, the Debtor's responsible individual, Feldman, has filed a related chapter 11 case, in which TAT and Sands also filed proofs of claim based on the TAT Judgment. Feldman has objected to the claims in his individual chapter 11 case on a standing basis, arguing that TAT lacked standing to bring the TAT Suit because it failed to register to do business in the state of California, and thus, the TAT Judgment should be overturned, thereby eliminating TAT's claim against Feldman. In addition, as the Debtor understands it, Feldman argues that because the deadline to file a proof of claim has passed, TAT may not remedy its lack of standing by registering with the California Secretary of State. Because the standing issues are being argued by Ropers in the TAT Appeal and because Feldman has raised similar arguments in his objection to TAT's claim in his individual case, to conserve costs and avoid duplication of effort, the Debtor reserves its right to object to TAT's or Sand's claim in this case, pending resolution of those issues by the Court of Appeal in the TAT Appeal and/or this Court in Feldman's objection to claim. The determination of these issues will necessarily affect the need for a chapter 11 plan, and the terms thereof, and importantly TAT's and/or Sand's standing to file a competing plan. [5]

---

[5] Feldman has provided the California Franchise Tax Board ("FTB") with hundreds of pages of documentation relating to TAT's repeated transacting of intrastate business in California and

**h. Extension Is Not For The Purpose Of Pressuring The Debtor's Creditors.**

23. The Debtor's request for an extension is not a negotiation tactic. The purpose of the extension is to avoid the unnecessary expense to the estate of filing a plan or addressing a creditor filed competing plan at this time because the terms of any plan will necessarily be dependent upon the outcome of the TAT Appeal and Cross Action.

**i. Whether An Unresolved Contingency Exists.**

24. In *Dow Corning Corp.*, 208 B.R. 661, 666 (Bankr.E.D.Mich. 1997), the bankruptcy court found that the type of unresolved contingency which would be relevant to a motion to extend exclusivity is one which is external to the case itself. The bankruptcy court further acknowledged that the extension of exclusivity periods is warranted in circumstances wherein a debtor is negotiating to sell its main asset as a going concern or where a debtor needs to complete business negotiations with a third party that are central to the operation of the debtor's business. *See id.* (*citing In re Trainer's Inc.*, 17 B.R. 246 (Bankr.E.D.Pa. 1982); *In re Swarate Coal Co.*, 49 B.R. 898 (Bankr.E.D.Pa. 1985)). Likewise, pending litigation is one factor that supports an extension of exclusivity. *See In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 410 (E.D. NY. 1989) ("a pending appeal, along with the consideration of other factors, may lead to a finding of cause for extending the exclusivity period.") (citing *United Press Internat'l, Inc.*, 60 B.R 265, 270 (Bankr. D. Colo. 1986)); *see also In re Texaco, Inc.*, 76 B.R. 322, 325 (Bankr. S.D.N.Y. 1987).

25. In this case, an unresolved contingency exists in that both the TAT Appeal and the Insurance Appeal are ongoing. At stake in the TAT Appeal is a $6.5 Million judgment against the Debtor. Substantial claims are also at stake in the Insurance Appeal.

26. An additional unresolved contingency exists in that the Cross Action has not been fully prosecuted. At stake in the Cross Action are claims by the Debtor in the millions of dollars.

27. Considering the factors considered by bankruptcy courts in determining whether

---

the standing issue is being argued by the Debtor in the TAT Appeal. Feldman has met with investigators and other individuals at the FTB and has been advised by FTB representatives, as recently as June 14, 2011, to subpoena the person most knowledgeable at the FTB to testify at any hearing to be held on the matter of the requirements of companies such as TAT to register with the Secretary of State, file California tax returns and pay California taxes and whether their failure to do so would impair their ability to use the Courts in the State of California.

"cause" exists to extend the Exclusivity Periods, the Debtor submits that the facts and circumstances of this case support the extension requested.

### III.    CONCLUSION

WHEREFORE, the Debtor respectfully requests that this Court enter its order:

1.    Granting the Motion;

2.    Extending to April 1, 2012 (or such other date as the Court hereafter may order) the time during which only the Debtor may file a plan;

3.    In the event that the Debtor files a plan on or before April 1, 2012, extending to June 1, 2012 (or such other date as the Court hereafter may order) the time during which only the Debtor may solicit acceptance of the plan;

4.    The foregoing extension shall be without prejudice to the rights of any party to seek to shorten or lengthen such period for good cause shown; and

5.    For such other and further relief as this Court determines to be just and proper.

Dated:  June 30, 2011                              **MURRAY & MURRAY**
                                                   A Professional Corporation

                                                   By:   */s/ Jenny Lynn Fountain*
                                                   _____
                                                         Jenny Lynn Fountain
                                                         Attorneys for Debtor