JOHN WALSHE MURRAY (074823)
JENNY L. FOUNTAIN (226241)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com
Email: jlfountain@murraylaw.com

Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| In re:<br><br>Z F M<small>ICRO</small> S<small>OLUTIONS</small>, I<small>NC</small>.,<br>A Delaware corporation,<br><br>Debtor.<br><br>926 Industrial Avenue<br>Palo Alto, CA 94303<br><br>Employer Tax I.D. No.: 30-0035122 | Case No. 10-60334-ASW-11<br><br>Chapter 11<br><br>Date July 18, 2011<br>Time: 2:00 p.m.<br>Place: United States Bankruptcy Court<br>280 S. First St., Room 3020<br>San Jose, CA 95113<br>Judge: Honorable Arthur S. Weissbrodt |

S<small>TATUS</small> C<small>ONFERENCE</small> S<small>TATEMENT</small> O<small>F</small> D<small>EBTOR</small>

ZF Micro Solutions, Inc., the debtor and debtor in possession herein (the "Debtor"), hereby submits its Chapter 11 status conference statement.

**1.   Case Commencement.**

On October 1, 2010, (the "Filing Date"), the Debtor filed for relief under Chapter 11 of the United States Bankruptcy Code. On October 4, 2010, the Debtor filed its Voluntary Petition. The Debtor is presently operating its business as a debtor in possession pursuant to the provisions of 11 U.S.C. §§ 1107 and 1108.

/ / /

## 2. History and Events Leading to Debtor's Bankruptcy Case.

The Debtor is a privately held fabless semiconductor company with its principal place of business in Palo Alto, California. It was founded and incorporated in Delaware by David L. Feldman ("Feldman") on January 28, 2002. Prior to the Debtor's incorporation, Feldman had founded and incorporated ZF Micro Devices, Inc., ("Devices") in California in July of 1995. In approximately late 2001 and early 2002, Devices' sole secured creditor, Gary Kennedy ("Kennedy"), who was also a Devices' Board member sitting by designation of investor Sands Brothers Venture Capital LLC ("Sands"), began foreclosure proceedings. On February 28, 2002, Kennedy purchased and acquired all of the assets of Devices by successfully credit bidding at the foreclosure sale. Immediately following the foreclosure sale to Kennedy, the Debtor, who had unsuccessfully bid at the sale, purchased the majority of Devices' assets from Kennedy and thereafter commenced operations on or about March 1, 2002.

In 1995, Devices began manufacturing and marketing a family of products based on an award-winning computer module called the OEM module Single Component Computer. These devices were, at the time, the most highly integrated, PC-compatible controller modules in the embedded systems market. They included full motherboard hardware and software functionality in a single, highly reliable component smaller than a credit card.

In 2000, Devices took this small form factor to the next level and combined full x86 PC functionality, together with its patented fail-safe technology, into a single chip, the ZFx86™ "PC-on-a-Chip." This device, just 1.4 inches square, represented the next level of integration of PC functionality. ZFx86™ is the only chip with a built-in FailSafe® mechanism for restoring operation after a system failure. The Intel x86 compatible ZFx86™ chip runs most PC software without modification and is bundled with a full PC BIOS and Linux O/S. It boots by simply applying power.

The Debtor outsources all chip layout, manufacturing, logistics and test functions while it supports all system architecture, technical support, sales and marketing internally. Prior to the foreclosure, Devices outsourced the chip layout, manufacturing, logistics and test functions to National Semiconductor Corporation ("NSC"). One of the assets acquired by the Debtor from Kennedy was the contract with NSC.

In March of 2002, NSC advised the Debtor that it would not honor the contract and would not manufacture the ZFx86™ for the Debtor. The Debtor filed a lawsuit in Santa Clara Superior Court against NSC. The suit went to a jury trial wherein the Debtor was awarded approximately $30 Million dollars. The court thereafter ordered a new trial based on a faulty jury instruction. The Debtor had exhausted its financial resources during the first trial and was unable to fund a new trial without additional capital contributions.

The Debtor thereafter solicited capital contributions from all of the original Devices shareholders ("Devices Shareholders") to fund the ongoing litigation. As part of the solicitation, the Debtor indicated that if the new trial were successful and after attorneys' fees and litigation costs were paid, those Devices Shareholders who invested in the Debtor to fund the ongoing litigation (the "Debtor Investors") would receive approximately a 10X return on their investment into the Debtor to fund the new trial, and if any funds remained then Devices' creditors would be paid and finally a pro-rata share would go to all Devices Shareholders. Thirty-four (34) of the eighty (80) Devices Shareholders became Debtor Investors by providing capital to the Debtor, and the Debtor was able to proceed with the new trial. Effective January 31, 2005, the Debtor finalized a settlement agreement with NSC ending an almost 3 year legal dispute wherein the Debtor was to receive approximately $20 Million dollars in cash and certain intellectual property. The settlement proceeds were deposited into the Debtor's attorney's trust account on approximately February 1, 2005, and thereafter were distributed to the Debtor Investors in accordance with their level of investment and the Debtor's promise of a 10X return (the "NSC Settlement Distributions"). The remainder of the funds, approximately $3.7 Million dollars, was then deposited into the Debtor's general operating account. All of the Debtor's outstanding creditor claims were paid in full before the NSC Settlement Distributions were made in February 2005.

On February 14, 2005, TAT Capital Partners LTD., f/k/a TAT Investment Advisory LTD ("TAT"), Sands and SB New Paradigm Associates LLC ("SB" and with Sands, the "Sands Parties" and with Sands and TAT, the "Plaintiffs" or "Respondents") filed suit in Santa Clara County Superior Court against the Debtor and the Debtor Investors alleging, among other things, that the NSC Settlement Distributions made to the Debtor Investors were fraudulent transfers (the "TAT

Suit"). All of the Plaintiffs were Devices Shareholders but none of the Plaintiffs contributed capital to the Debtor or ever became Debtor Investors. The Debtor filed a mandatory counterclaim for breach of fiduciary duty, among other claims, (the "Cross Action") and the TAT Suit was eventually consolidated with the Cross Action. The court, however, later severed the Cross Action. The TAT Suit proceeded to a three phase trial wherein, during phase one, the court determined that the Plaintiffs and the Debtor had entered into certain enforceable contracts. During the second phase, a jury returned a verdict that the Debtor had breached its contract with the Plaintiffs on February 5, 2005 causing harm to the Plaintiffs in the aggregate amount of $4,390,506.03. During the third phase of the trial, on May 12, 2010 the jury returned a verdict that each of the NSC Settlement Distributions made to the Debtor Investors constituted actual fraudulent transfers. Thereafter, on June 10, 2010, the court entered judgment against the Debtor and the Debtor Investors, and on August 23, 2010, the court entered a first amended judgment in favor of the Plaintiffs and against the Debtor (the "TAT Judgment") as follows: judgment in favor of TAT in the amount of $4,460,447.70, plus costs; judgment in favor of the Sands Parties in the amount of $2,135,859.63, plus costs. The court also entered judgments against the individual Debtor Investors in favor of the Plaintiffs in the respective amounts received as part of the NSC Settlement Distributions.

On June 14, 2010, TAT filed an Abstract of Judgment against the Debtor in the amount of $4,550,447.70. On June 17, 2010, TAT requested and the court entered a Writ of Execution against the Debtor for $4,550,472.70, plus cost and daily interest. On June 29, 2010, TAT filed a Notice of Levy against the Debtor's bank account and obtained approximately $5,800 from the Debtor's account as a result thereof. TAT has since filed a partial satisfaction of judgment to reflect the reduction of its judgment lien by the approximately $5,800 obtained from the account levy.

The Debtor has appealed the TAT Judgment which appeal is pending (the "TAT Appeal"). After the May 2010 jury verdict in the TAT Suit, the Debtor and certain of the Debtor Investors (collectively, the "Appellants") began preparing for an eventual appeal and retained Ropers, Majeski, Kohn & Bentley ("Ropers") for the sole purpose of serving as appellate counsel. On August 25, 2010, Ropers, on behalf of Appellants, filed a Notice of Appeal. On January 19, 2011, this Court approved the employment of Ropers as special appellate counsel for Debtor. Susan

Handelman ("Handelman") is lead counsel for Ropers relative to the TAT Appeal.

The Debtor generates approximately $10,000 a month in gross revenue. The $3.7 Million dollars the Debtor received out of the NSC Settlement Distributions was fully exhausted to cover operating costs and to defend against the TAT Suit as well as to prosecute suits against the Debtor's Directors' and Officers' insurance carriers relating to refusals to defend. Both the TAT Suit and a suit against one of the Debtor's insurance carriers are on appeal. The Debtor has had to suspend salaries for all employees and terminate or furlough all employees. In addition, the Debtor has borrowed approximately $700,000.00 from its shareholders to maintain operations and defend and prosecute the various suits.

**3.     Creditors' Committee.**

To date, no official committee of unsecured creditors has been appointed in this case.

**4.     Appointment of Responsible Individual.**

Pursuant to this Court's Order of October 4, 2010, David L. Feldman has been appointed as the Debtor's Responsible Individual.

**5.     Order Limiting Notice.**

On November 10, 2010, the Court entered its ORDER LIMITING NOTICE providing as follows:

All notices required to be given pursuant to Federal Rules of Bankruptcy Procedure ("F.R.B.P.") 2002(a)(2), (3) and (6), and any other such notices as are required to be given with respect to the administration of this case, exclusive of the notices contemplated in F.R.B.P. 2002(a)(1), (4), (5), (7), (8) and (b), shall be limited to the following:

    i.    The natural person responsible for the duties and obligations of the Debtor pursuant to B.L.R. 4002-1 of the Local Bankruptcy Rules for the Northern District of California;

    ii.    Any Official Committee of Unsecured Creditors and its counsel;

    iii.    All secured creditors;

    iv.    All creditors listed on the Debtor's List of Creditors Holding 20 Largest Unsecured Claims;

    v.    The Office of the United States Trustee in San Jose, California;

vi.  Parties affected by the particular Motion; and

vii. Any party in interest who serves on the Debtor's counsel and files with the Clerk of the Court a request for special notice.

**6.  Employment of Professionals.**

<u>Murray & Murray</u>:  Pursuant to this Court's Order of October 13, 2010, the Debtor was authorized to employ Murray & Murray, A Professional Corporation, as its bankruptcy counsel in this case.

<u>Ropers Majeski Kohn & Bentley PC</u>:  Pursuant to this Court's Order of October 21, 2010, the Debtor was authorized to employ Ropers as its special appellate counsel to advise and represent the Debtor with respect to the TAT Appeal.

<u>Adelson, Hess & Kelly and Shernoff Bidart Echeverria, LLP</u>:  Pursuant to Court Order of April 21, 2011, the Debtor was authorized to jointly employ the law firms of Adelson Hess & Kelly ("<u>AHK</u>") and Shernoff Bidart Echeverria, LLP ("<u>SBE</u>") to represent the Debtor in the appeal of an action brought by the Debtor against its Directors' and Officers' insurance carriers.

<u>Trepel Greenfield Sullivan and Draa, LLP</u>:  The Debtor prepared a draft application for the law firm of Trepel Greenfield Sullivan and Draa, LLP ("<u>Trepel</u>") related to representing the Debtor in the Cross Action.  Debtor's counsel however has been informed by Trepel that it will not represent the Debtor in the Cross Action due to alleged conflict issues raised by TAT.

**7.  Claims Bar Dates.**

The Court established a claims bar date of February 8, 2011 for the filing of non-governmental proofs of claim, and March 30, 2011 (180 days after the Filling Date) for the filing of governmental proofs of claim.

**8.  Monthly Operating Reports.**

The Debtor's first monthly operating report was filed on November 22, 2010 for the period of October 1, 2010 through October 31, 2010 and the Debtor is current in its monthly operating report filings.

**9.  Statement of Financial Affairs and Schedules.**

The Debtor's Statement of Financial Affairs and Schedules of Assets and Liabilities were

filed on October 12, 2010 and amendments to schedule B were filed on November 29, 2010.

10. **Initial Debtor Interview.**

The Initial Debtor Interview took place on November 8, 2010 and was concluded on that day.

11. **Section 341 Meeting.**

The Section 341 Meeting of Creditors was held and concluded on November 10, 2010.

12. **Cash Collateral.**

On October 11, 2010, the Debtor filed DEBTOR'S MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL (the "Cash Collateral Motion"). On October 25, 2010, TAT filed the OBJECTION OF TAT CAPITAL PARTNERS, LTD. TO DEBTOR'S MOTION FOR USE OF CASH COLLATERAL and on November 1, 2010 the Debtor filed the REPLY TO OBJECTION OF TAT CAPITAL PARTNERS, LTD. TO DEBTOR'S MOTION FOR USE OF CASH COLLATERAL. The hearing on the Cash Collateral Motion was initially to be heard on November 8, 2010 and was continued to December 7, 2010 at 1:45 p.m. with supplemental briefs due on November 30, 2010. On November 30, 2010, the Debtor filed its supplemental brief on time. On December 6, 2010, TAT filed late supplemental briefs. On December 7, 2010 the Court read its tentative decision granting the Debtor's Motion, heard oral argument and continued the hearing to December 16, 2010 with supplemental briefs due by December 10, 2010 for the Debtor and December 14, 2010 at 3:00 p.m. for TAT. The parties filed supplemental briefs as instructed by the Court. At the hearing on December 16, 2010 the Court granted the Debtor's Motion and incorporated its tentative decision into its final decision.

13. **Lease.**

The Debtor successfully negotiated with its real property landlord whereby the Debtor and landlord entered into a new real property lease, whereby, effective, February 1, 2011, the Debtor rejected its old real property leases, reduced its square footage significantly and its monthly rental obligation by $3,800.00 and the landlord waived any and all rejection claims. On January 7, 2011, the Debtor filed its NOTICE OF NEW LEASE AND REJECTION OF OLD LEASES AND OPPORTUNITY FOR HEARING. No objections or requests for hearing were filed or served with respect to the notice and on February 16, 2011, this Court entered an order authorizing the Debtor to enter into the new lease.

///

**14. <u>TAT Appeal and Cross Action.</u>**

In August, 2010, the Debtor, among other defendants, filed a notice of appeal from the TAT Judgment. Pursuant to the TAT Judgment, Respondents are entitled to approximately $6.7 million plus costs of suit and post-judgment interest. In connection with the TAT Appeal, Appellants *other than* Debtor, Feldman and Marsha Feldman Armstrong posted appeal bonds in excess of $5 million. In addition, Respondents collected over $400,000 by executing on the judgment(s) before the bonds were perfected and/or by voluntary payments by various defendants.

The TAT Appeal is currently pending in the California Court of Appeal, Sixth Appellate District (the "<u>Court of Appeal</u>"), assigned Appeal No. H035968.

On January 4, 2011, the Santa Clara Superior Court filed the appellate record in the Court of Appeal. The appellate record is extensive—36 volumes of Reporter's Transcript and 48 volumes of Clerk's Transcript. The Court of Appeal's docket states that the record was delivered to the Court of Appeal in seven boxes.

On May 3, 2011, with <u>one</u> stipulated 60-day extension of time, plus the time afforded by the Court of Appeal's rules, the Debtor served on Respondents and sent to the Court of Appeal the APPELLANTS' OPENING BRIEF (the "<u>Debtor's Opening Brief</u>"). The Debtor's Opening Brief was accompanied by a motion to file an oversized brief consisting of 16,656 words (as compared to a normal sized brief of 14,000 words).

On May 19, 2011, the Court of Appeal granted the Debtor's motion to file an oversized brief and "officially" filed the Debtor's Opening Brief. The Court of Appeal set the due date for TAT's and Sand's RESPONDENTS' BRIEFS (the "<u>Responses</u>") for June 20, 2011. The same day the court granted the Debtor's motion and filed the Debtor's Opening Brief, May 19, TAT and Mark Putney, through TAT's counsel, moved the Court of Appeal to disqualify Ropers from representing the Appellants, including the Debtor, in the TAT Appeal and moved to strike the Debtor's Opening Brief. Ropers, through retained counsel, opposed the disqualification motion. The disqualification motion/strike motion remains pending, but the Court of Appeal's docket indicates that the Court of Appeal plans to issue an order on the motion on July 5, 2011.

Three business days after the Debtor's Opening Brief was "officially" filed (and TAT had

moved to strike it), on May 24, 2011, TAT's counsel requested the Debtor stipulate to a 60-day extension of time (from June 20 to approximately August 20) for TAT and Sands to file their Response. Because appellate counsel for TAT (and Sands) were also trial counsel and are very familiar with the appellate record, and because of the need to move the state court appeal along quickly, the Debtor offered TAT and Sands a stipulation to a *30 day extension of time*, rather than 60 days.

On May 24, 2011, TAT's counsel rejected the Debtor's offer of a 30 day stipulated extension and announced TAT and Sands would apply to the Court of Appeal for a 60-day extension.

On May 31, 2011, Debtor filed, with the Court of Appeal, a document entitled NOTICE OF NON-OPPOSITION TO 30-DAY EXTENSION OF TIME TO FILE RESPONDENTS' BRIEFS. In that document, the Debtor informed the Court of Appeal of the Debtor's 30 day stipulated extension offer and why 30 days is sufficient given the circumstances.

On June 9, 2011, Respondents filed an application for a 60-day extension of time in the Court of Appeal.

On June 16, 2011, the Court of Appeal granted Respondents a 30-day extension of time to file their Responses. The Responses are due on July 20, 2011. The Court of Appeal's rules provide an "automatic grace period" of an additional 15 days, and as such the Debtor expects the Responses will be filed in early August.

After Respondents' Responses are filed, the Debtor anticipates that it will file a reply brief in September, 2011.

Thereafter, the Court of Appeal will hear oral argument and issue a decision.

The Debtor has utilized best efforts to move the TAT Appeal along quickly and will continue to do so. The Debtor expects that the Court of Appeal will issue a decision in the TAT Appeal before April 1, 2012.

**15.    Merits and Issues Presented In The TAT Appeal.**

The Appellants raise crucial issues, some of which are of a Constitutional dimension, including: (1) the trial court's functional deprivation of a requested jury trial on the fundamental breach of contract claim in the case against the Appellants; and (2) exclusion of *defendant* and

Debtor's corporate representative and Responsible Individual, Feldman, from the courtroom, then banning him from being near the courtroom, then banning him from being anywhere in the courthouse where the jurors might see him. In addition, the Debtor's Opening Brief establishes that the judgment imposes statutorily impermissible, excessive damages against the Appellants, lays out that the trial court, on the first day of trial, impermissibly severed *out of the case* the Appellants' entire cross-complaint (which a court had previously characterized as a "compulsory" cross-complaint), and addresses Respondents' lack of "standing."

### 16. The Cross Action.

The Debtor has not begun prosecuting the Cross Action against TAT for the following reasons, among others:

a. Action has been delayed on the Cross Action pending a ruling in the TAT Appeal because severing of the Cross Action from the TAT Suit is a key issue in the TAT Appeal and Debtor believes it is optimal and most efficient if all arguments related to the severing of the Cross Action are decided by the Court of Appeal before proceeding with the Cross Action; and

b. TAT alleged that the Debtor's proposed counsel, Anthony Trepel, has a conflict of interest based on the fact that Anthony Trepel testified at trial in the TAT Suit. As such, Debtor must locate and engage new counsel to proceed once the Court of Appeal issues a ruling on the TAT Appeal.

### 17. Insurance Litigation Appeal.

Pre-petition, the Debtor brought a suit against Underwriters at Lloyd's London, its original Director's and Officer's insurance carrier in Santa Clara County Superior Court (case number 1-04-CV-017803) relating to a claim arising out of the NSC Litigation ("Lloyd's Suit"). The court issued its summary judgment in favor of the defendant and the Debtor appealed and oral arguments were heard pre-petition. Post-petition, the appellate court affirmed the summary judgment award and granted the defendant its costs. Since that time, and pursuant to Court order, the Debtor and the defendant have agreed to dismiss the suit against Underwriters at Lloyd's London with prejudice.

Pre-petition, the Debtor brought a related suit against Illinois Union Insurance, the Debtor's superseding Director's and Officer's Insurance carrier, entitled *ZF Micro et. al. vs. Illinois Union*

*Insurance*, case number 1-04-CV-07803, originally filed in Santa Clara County Superior Court (the "Union Suit"). Eventually the Lloyd's Suit and Union Suit were consolidated. Pursuant to the Union Suit, the Debtor brought suit against defendant insurer for its refusal to defend in certain state court actions. The Debtor is seeking substantial damages, including defense fees, consequential damages and punitive damages from the defendant. The court granted summary judgment in favor of the defendant Illinois Union Insurance and the Debtor appealed (the "Insurance Appeal"). The matter is on appeal before the Court of Appeal. The matter has been fully briefed. Oral arguments are set for July 13, 2011. The Debtor understands that, generally, a decision by the Court of Appeal will be issued within ninety days after the matter is submitted at oral arguments (well before exclusivity will expire if this Court grants this Motion).

The issues before the Court of Appeal include, among others:

a. In 2002, NSC filed a cross-complaint against Debtor, among others, that alleged a breach of contract cause of action against Devices and sought recovery against the Debtor under the doctrine of successor liability. Defendant Illinois Union claimed that the breach of contract cross-complaint against Devices by NSC constituted a prior claim during a period when Illinois Union was not the company's insurer. However, the Debtor alleges, among other things, that Illinois Union is the proper insurer because part of the claimed coverage arises out of a claim by NSC against Feldman which was first raised when NSC named Feldman as a cross-defendant for the first time in its amended cross-complaint in 2003 during the period Illinois Union's coverage was in effect;

b. Whether the insolvency exclusion applies; and

c. Triable issues of material fact also exist as to the cause of action for breach of the implied covenant of good faith and fair dealing regarding the denial of the original claim and cross complaint claim against Feldman.

**18. Relief From Stay.**

The Debtor entered into two separate stipulations with the relevant parties for limited relief from the automatic stay so that the parties may proceed with TAT Appeal and the Cross Action. Both stipulations were filed with this Court. TAT filed the Cross Action stipulation and the Debtor filed the TAT Appeal stipulation. Orders granting relief, as requested, were entered by this Court

with respect to both the TAT Appeal and the Cross Action.

**19.     Exclusivity and Plan of Reorganization.**

On January 6, 2011, the Debtor filed its MOTION FOR ORDER EXTENDING EXCLUSIVE PERIODS DURING WHICH ONLY THE DEBTOR MAY FILE A PLAN AND SOLICIT ACCEPTANCES THEREOF ("Exclusivity Motion"), whereby the Debtor requested the maximum extension of the exclusive periods.  TAT objected to the requested relief.  After due notice thereof, on January 28, 2011, the Court held a hearing on the Exclusivity Motion.  Pursuant to Court order, this Court extended exclusivity for the Debtor to file a plan through August 1, 2011 and to solicit acceptances thereof through October 1, 2011.  The granting of the extensions was without prejudice for the Debtor to bring an additional motion to further extend the exclusivity periods.

On June 30, 2011, the Debtor filed its SECOND MOTION FOR ORDER EXTENDING EXCLUSIVE PERIODS DURING WHICH ONLY THE DEBTOR MAY FILE A PLAN AND SOLICIT ACCEPTANCES THEREOF ("Exclusivity Motion") , whereby the Debtor requested a further extension of the exclusive periods.  The hearing is set for July 21, 2011 at 3:00 p.m. and objections are due July 14, 2011.  TAT has filed an objection.

The Debtor continues to operate as normal and is analyzing plan terms.  With respect to a plan of reorganization, plan terms will necessarily depend upon the outcome of the TAT Appeal, the Cross Action and the insurance litigation appeal as each may significantly alter the Debtor's liabilities and assets.  If the Debtor is successful on the TAT Appeal, approximately $6.5 Million in unsecured debt will be eliminated.  At that point, the Debtor will be better able to formulate a plan without contingencies or alternatives relative to the TAT Appeal.

Likewise, if the Debtor does not succeed, the Debtor believes that it can obtain sufficient funding from new equity to fund a confirmable and successful chapter 11 plan.  Possible plan alternatives include, without limitation, either a liquidating plan or a reorganization plan that will pay its allowed secured claims in full and eliminate most unsecured debt.  Of the unsecured debt, approximately $6.5 Million is held by TAT and Sands and approximately $1.5 Million is held by other creditors.   With respect to allowed unsecured claims, the Debtor anticipates a plan with various classes. It is anticipated that all classes will be impaired and that at least one impaired class

1 entitled to vote will vote to accept the plan.[1]

2 **20.** **Continuance of Chapter 11 Status Conference.**

3 The Debtor proposes that the Chapter 11 status conference be continued to September 26,
4 2011 at 2:00 p.m.

Respectfully submitted,

Dated: July 11, 2011          **MURRAY & MURRAY**
A Professional Corporation


By:  */s/ Jenny Lynn Fountain*
      Jenny Lynn Fountain
      Attorneys for Debtor

---

[1] The Debtor reserves its right to propose a plan on different terms than those identified herein.